# Illinois Official Reports

## Appellate Court

*LMP Services, Inc. v. City of Chicago*, 2017 IL App (1st) 163390

| | |
|---|---|
| Appellate Court Caption | LMP SERVICES, INC., Plaintiff-Appellant, v. THE CITY OF CHICAGO, Defendant-Appellee. |
| District & No. | First District, First Division<br>Docket No. 1-16-3390 |
| Filed | December 18, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CH-41235; the Hon. Helen A. Demacopoulos, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Eimer Stahl, LLP, of Chicago (James W. Joseph, of counsel), and Institute for Justice, of Arlington, Virginia (Robert Frommer, Robert Gall, and Erica J. Smith (all *pro hac vice*), of counsel), for appellant.<br><br>Edward N. Siskel, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, and Suzanne M. Loose, Assistant Corporation Counsel, of counsel), for appellee. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Presiding Justice Pierce and Justice Mikva concurred in the judgment and opinion. |

**OPINION**

¶ 1        Plaintiff-appellant, LMP Services, Inc. (LMP), filed this lawsuit seeking both declaratory and injunctive relief against two sections of an ordinance passed by defendant-appellee, City of Chicago (City). The two challenged ordinances pertained to the operation of mobile food vehicles (hereinafter food trucks) within Chicago. Under the first challenged ordinance, food trucks may not, with limited exceptions, locate themselves within 200 feet of the principal customer entrance of a restaurant located at street level. LMP challenged this ordinance under the due process and equal protection clauses of the Illinois Constitution. Under the second challenged provision, food trucks must be equipped with a Global Positioning System (GPS) that sends real-time data to any service that has a publicly accessible application programming interface. LMP challenged this provision as a violation of its right under the Illinois Constitution to be free from unreasonable searches.

¶ 2        After LMP filed an amended complaint, the City moved to dismiss all of LMP's claims. The circuit court granted the motion with respect to the equal protection claim but denied the motion as to the due process and search claims. The City answered the remaining claims and the parties proceeded to discovery. At the close of discovery, the parties moved for cross-summary judgment. As to the 200-foot rule, the circuit court found it rationally related to (1) the City's need to balance the interests of both the food trucks and brick-and-mortar restaurants and (2) the City's need to balance sidewalk congestion. As to the GPS requirement, the circuit court found LMP lacked standing because the City had never requested its GPS information and, therefore, a search had not occurred. The court further concluded that, even if a search had occurred, the search was reasonable and therefore constitutional.

¶ 3        LMP now appeals the circuit court's grant of summary judgment in favor of the City. Upon this court's review, we agree with the circuit court's findings that LMP's constitutional challenge to both sections of the ordinance fails. The City has a critical interest in maintaining a thriving food service industry of which brick-and-mortar establishments are an essential part. The 200-foot exclusion represents a rational means of ensuring the general welfare of the City and is neither arbitrary nor unreasonable. The GPS is not a search pursuant to *United States v. Jones*, 565 U.S. 400 (2012). The GPS rule represents a method of requiring a licensee to maintain records as to its operational location in an electronic form as a condition of conducting business from the city street. Accordingly, the circuit court's grant of summary judgment in favor of the City is affirmed.

¶ 4                                        JURISDICTION
¶ 5        On June 13, 2013, the circuit court granted the City's motion to dismiss LMP's equal protection claim. On December 5, 2016, the circuit court granted the City's motion for summary judgment on LMP's due process and illegal search claims. LMP's cross-motion for summary judgment was denied the same day. On December 28, 2016, LMP timely filed its notice of appeal as to the December 5, 2016 order.[1] Accordingly, this court has jurisdiction over this matter pursuant to article VI, section 6, of the Illinois Constitution and Illinois Supreme Court Rules 301 and 303. Ill. Const. 1970, art. VI, § 6; Ill. S. Ct. R. 301 (eff. Feb. 1,

_____
[1]LMP does not challenge the order of June 13, 2013, and has therefore forfeited review of its equal protection claim. *Lewanski v. Lewanski*, 59 Ill. App. 3d 805, 815-16 (1978).

1994); R. 303 (eff. May 30, 2008).

¶ 6                                                    BACKGROUND

¶ 7        The plaintiff-appellant, LMP is a closely held Illinois corporation in Elmhurst, Illinois. Its owner, Laura Pekarik, operates the food truck called Cupcakes for Courage. Cupcakes for Courage is licensed in Chicago as a "mobile food dispenser," and since June 2011, Pekarik has sold cupcakes from the food truck.

¶ 8        On July 25, 2012, the Chicago city council passed an ordinance to expand food truck operations within the city limits of Chicago. The ordinance allows for food preparation on food trucks and established a number of regulations governing location, operation, and inspection of food trucks. The ordinance authorizes the commissioner of transportation for the City to establish fixed stands where parking space for food trucks is reserved. Chicago Municipal Code § 7-38-117(c) (added July 25, 2012). The ordinance requires a "minimum of 5 such stands" in each "community area *** designated in section 1-14-010 of this Code [(Chicago Municipal Code § 1-14-010 (added Dec. 15, 1993))], that has 300 or more retail food establishments." *Id.* Those community areas are the Loop,[2] Near West, Near North, Lincoln Park, Lakeview, and West Town.

¶ 9        Beyond food stands, food trucks may park in legal parking spots on the street for up to two hours. Chicago Municipal Code § 7-38-115(b) (amended July 25, 2012). Food trucks may not park within 20 feet of a crosswalk, 30 feet of a stop light or stop sign, or adjacent to a bike lane. Chicago Municipal Code § 7-38-115(e) (amended July 25, 2012). In addition, the ordinance provides:

>  "No operator of a mobile food vehicle shall park or stand such vehicle within 200 feet of any principal customer entrance to a restaurant which is located on the street level; provided, however, the restriction in this subsection shall not apply between 12 a.m. and 2 a.m." Chicago Municipal Code § 7-38-115(f) (amended July 25, 2012).

"Restaurant" is defined as:

>  "[A]ny public place at a fixed location kept, used, maintained, advertised and held out to the public as a place where food and drink is prepared and served for the public for consumption on or off the premises pursuant to the required licenses. Such establishments include, but are not limited to, restaurants, coffee shops, cafeterias, dining rooms, eating houses, short order cafes, luncheonettes, grills, tearooms, and sandwich shops." *Id.*

There are two exceptions to the 200-foot requirement. The first exception allows food trucks to park at one of the five established food stands even if that stand is within 200-feet of the primary entrance of a restaurant. The second exception allows food trucks to park near construction sites and serve those sites.

¶ 10       Mobile food vendors are also subject to regulations designed to ensure safe food preparation and sanitary operations, including requirements for storage and plumbing equipment, food preparation, cleaning products, temperature control, and the presence of certified food service manager when food is prepared. Chicago Municipal Code §§ 7-38-132;

---

[2]The Loop is geographically defined as the downtown area of Chicago bordered by Lake Michigan to the east, the Chicago River to the north and west, and Congress Parkway to the south.

7-38-134 (added July 25, 2012). Each food truck must be linked to a commissary used daily for supplying, cleaning, and servicing. Chicago Municipal Code § 7-38-138 (added July 25, 2012). The Chicago board of health (board) is authorized to enact rules and regulations to implement those requirements (Chicago Municipal Code § 7-38-128 (added July 25, 2012)) and the department of public health conducts inspections. Chicago Municipal Code § 7-38-126 (added July 25, 2012).

¶ 11    The ordinance also has a requirement concerning the use of GPS equipment on the food trucks. The ordinance provides:

> "Each mobile food vehicle shall be equipped with a permanently installed functioning Global-Positioning-System (GPS) device which sends real-time data to any service that has a publicly-accessible application programming interface (API). For purposes of enforcing this chapter, a rebuttable presumption shall be created that a mobile food vehicle is parked at places and times as shown in the data tracked from the vehicle's GPS device." Chicago Municipal Code § 7-38-115(l) (amended July 25, 2012).

The Board subsequently enacted "Rules and Regulations for Mobile Food Vehicles." Rule 8 provides that the GPS device be permanently installed; be an " 'active,' " not " 'passive,' " device that sends real-time location data to a GPS provider; and be accurate no less than 95% of the time. Chicago Board of Health, Rules and Regulations for Mobile Food Vehicles, R. 8(A)(1)-(3) (eff. Aug. 7, 2014), https://www.cityofchicago.org/content/dam/city/depts/bacp/general/MFV_Rules_and_Regulations-8-7-2014.pdf. The City claimed that the GPS requirement's purpose was so that it could locate food trucks in order to conduct field inspections and investigate public health complaints.

¶ 12    The rule further provides that the device must function during business operations and while at a commissary and transmit GPS coordinates to the GPS service provider at least once every five minutes. Chicago Board of Health, Rules and Regulations for Mobile Food Vehicles, R. 8(A)(4)-(5) (eff. Aug. 7, 2014). The rule further provides that the City will not request GPS information without consent, a warrant, or court authorization unless the information is needed "to investigate a complaint of unsanitary or unsafe conditions, practices, or food or other products at the vehicle"; "to investigate a food-related threat to public health"; to "establish[h] compliance with" the ordinance and regulations; or for "emergency preparation or response." Chicago Board of Health, Rules and Regulations for Mobile Food Vehicles, R. 8(B) (eff. Aug. 7, 2014). Rule 8 also clarified that, while GPS providers must "be able to provide" an API "that is available to the general public," licensees need not "provide the appropriate access information to the API" unless the City establishes a website to display food truck locations and the licensee chooses to participate. Chicago Board of Health, Rules and Regulations for Mobile Food Vehicles, R. 8(C)-(D) (eff. Aug. 7, 2014). The food truck "is not required to provide such information or otherwise allow the City to display the vehicle's location." Chicago Board of Health, Rules and Regulations for Mobile Food Vehicles, R. 8(D) (eff. Aug. 7, 2014).

¶ 13    LMP filed this lawsuit on November 14, 2012, and later amended it on March 8, 2013, challenging both the 200-foot exclusion rule and GPS requirement. Its suit alleged that the 200-foot rule violated the due process and equal protection clauses of article I, section 2, of the Illinois Constitution and the GPS tracking scheme violated the search, seizures, privacy and interceptions clause of article I, section 6, of the Illinois Constitution. The City moved to dismiss the complaint in its entirety, and after briefing, the circuit court granted the City's

motion with respect to LMP's equal protection claim but denied it as to the due process and search claims. The City then answered the amended complaint and the parties proceeded to discovery. The City set forth three reasons for imposing the 200-foot restriction: (1) balance the interests of brick-and-mortar restaurants with the food trucks, (2) encourage food trucks to locate in underserved areas, and (3) manage sidewalk congestion.

¶ 14    The parties engaged in an extensive discovery phase regarding the City's justification for the 200-foot rule and the GPS requirement. The City testified that the 200-foot rule applied "as the crow flies," radiating out 200 feet in all directions from a restaurant's front door. This means a food truck cannot park on the other side of the street or a block over if that position is within 200 feet of a restaurant's principal entrance. The rule also applies to a food truck parked on private property. Pekarik's testified that the 200-foot rule excluded her from many areas she would like to conduct business from in the Loop. As to the construction site exception, the City testified that trucks need only operate within proximity of the construction site, though it could not give a precise definition of "proximity."

¶ 15    Plaintiff hired expert witness, Renia Ehrenfeucht, a professor of urban planning and sidewalk usage, to conduct an observational study of seven different food truck locations across the northern portion of the Loop. Based on what her team observed, she reached two conclusions: (1) there was no observed difference in pedestrian congestion impacts based on the distance between a food truck's operations and a restaurant's front door and (2) there was no difference in the degree of pedestrian congestion at mobile food truck stand locations versus other public-private locations.

¶ 16    The City explained the need for the GPS requirement because it may be necessary to track a food truck's location to conduct a health or administrative investigation. The City admitted that it had never requested GPS data from any licensed food truck. In the few instances the City needed to find a truck, the field inspectors utilized social media to determine a food truck's location. Since the GPS requirement only applies while the food truck is in operation, the City admitted the GPS unit may need to be physically turned on by the truck operator.

¶ 17    At the close of discovery, the parties filed cross-motions for summary judgment. The circuit court ruled that rational-basis review applied to LMP's due process challenge to the 200-foot rule. Under this review, the circuit court upheld the 200-foot rule based on the City's argument that the rule balances the interests of brick-and-mortar restaurants and food trucks. The circuit court found the rule rationally related to the City's interest in managing sidewalk congestion. It rejected the argument that the rule helped spread food truck business to underserved sections of the city. As to the GPS requirement, the court determined LMP lacked standing to even challenge the provision because LMP failed to show its data had ever been requested by the City. The circuit court further explained that even if a search had taken place, the search was reasonable because the City's interest in food safety, the GPS data is necessary to find food trucks for purposes of inspection or notifications, and the rules limit the type of information and the circumstances under which the City will obtain it.

¶ 18    LMP timely appealed the circuit court's grant of summary judgment and this appeal now follows.

ANALYSIS

On appeal, LMP raises two issues: (1) the circuit court erred in concluding that the 200-foot rule does not violate its substantive due process rights, and (2) the circuit court erred in concluding the GPS requirement is not a search.

LMP's appeal arises from an order granting summary judgment in favor of the City upholding the validity of the 200-foot rule and the GPS requirement, our review is therefore *de novo*. *Progressive Universal Insurance Co. of Illinois v. Liberty Mutual Fire Insurance Co.*, 215 Ill. 2d 121, 128 (2005). *De novo* review is also the appropriate standard when the appellate court reviews the constitutionality of a statute. *Kanerva v. Weems*, 2014 IL 115811, ¶ 33.

LMP alleges the 200-foot restriction violates its due process right under article I, section 2 of the Illinois Constitution, which protects the right of Illinoisans to pursue a legitimate occupation. In claiming a violation of its due process rights, LMP states in its amended complaint, "[t]his lawsuit seeks to vindicate the fundamental rights of the Plaintiffs, who own and operate mobile-vending vehicles, to earn an honest living free from unreasonable and anticompetitive government restrictions."

The fourteenth amendment to the United States Constitution and article I, section 2, of the Illinois Constitution protect individuals from the deprivation of life, liberty, or property without due process of law. U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2. Case law pertaining to due process recognizes two distinct due process analyses: substantive due process and procedural due process. *Doe v. City of Lafayette*, 377 F.3d 757, 767-68 (7th Cir. 2004); *In re J.R.*, 341 Ill. App. 3d 784, 791 (2003). "Whereas procedural due process governs the procedures employed to deny a person's life, liberty or property interest, substantive due process limits the state's ability to act, irrespective of the procedural protections provided." *In re Marriage of Miller*, 227 Ill. 2d 185, 197 (2007) (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)). In the case before us, LMP raises no argument concerning the denial of notice or procedure; accordingly, we review LMP's claim only as it relates to substantive due process.

When a party claims a due process violation, a court "must first ascertain that a protected interest has been interfered with by the state. Then and only then does one consider what process is due." *Big Sky Excavating, Inc. v. Illinois Bell Telephone Co.*, 217 Ill. 2d 221, 241 (2005); *In re J.W.*, 204 Ill. 2d 50, 66 (2003). This is a critical step because the "nature of the right dictates the level of scrutiny a court must employ in determining whether the statute in question comports with the constitution." *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 307 (2008).

LMP frames the 200-foot rule as a means to suppress its economic rights in violation of article I, section 2, of the Illinois Constitution. The ordinance states in relevant part, "[n]o operator of a mobile food vehicle shall park or stand such vehicle within 200 feet of any principal customer entrance *** which is located on the street level." Chicago Municipal Code § 7-38-115(f) (amended July 25, 2012). In arguing that its due process right has been violated, LMP cites the accepted general principle that "every citizen has the right to pursue a trade, occupation, business or profession" and this right "constitutes both a property and liberty interest entitled to the protection of the law as guaranteed by the due process clauses of the Illinois and Federal constitutions." *Coldwell Banker Residential Real Estate Services of Illinois, Inc. v. Clayton*, 105 Ill. 2d 389, 397 (1985).

¶ 26    The right to pursue a profession is not a fundamental right for substantive due process purposes, and the legislature's, or in this case the Chicago City council's, infringement on this right need only be examined using the rational basis test. *Potts v. Illinois Department of Registration & Education*, 128 Ill. 2d 322, 329 (1989). The state, in the proper exercise of its general police powers, may regulate this "economic right," where the public health, safety, or general welfare so requires. *Id.* at 330 (citing *Pozner v. Mauck*, 73 Ill. 2d 250 (1978)).

¶ 27    The fact that the challenged provisions are part of an ordinance enacted by the City and not statutes enacted by the Illinois General Assembly is immaterial. Under the Illinois Constitution of 1970, the City is a home rule unit of local government. Ill. Const. 1970, art. VII, § 6. This provision of our constitution directly allows the City to "regulate for the protection of the public health, safety, morals and welfare." Ill. Const. 1970, art. VII, § 6(a). Local governments granted home rule act with the same powers as the state unless specifically limited by the General Assembly. *City of Urbana v. Houser*, 67 Ill. 2d 268, 273 (1977).

¶ 28    While acknowledging the rational basis standard, LMP argues that under Illinois law, the rational basis test requires a "definite and reasonable relationship to the end of protecting the public health, safety and welfare." *Church v. State*, 164 Ill. 2d 153, 165 (1995); *Krol v. County of Will*, 38 Ill. 2d 587, 590 (1968) (requiring a definite and substantial relation to a recognized police-power purpose). LMP fails to recognize that this argument concerning a "heightened" rational basis test was rejected by the Illinois Supreme Court in *Napleton*, 229 Ill. 2d 296. In that case, the plaintiff "used the term 'substantial relationship' or 'real and substantial' to describe the applicable level of judicial scrutiny" our supreme court should apply in reviewing her facial challenge to Hinsdale's zoning law. *Id.* at 309. In rejecting plaintiff's argument, the court stated,

> "We clarify that the 'substantial relation' language used in cases addressing the validity of zoning regulations has been simply an alternate statement of the rational basis test which was tailored to address the specific interests advanced by the enactment of zoning ordinances, namely, the promotion of the public health, safety, morals, or general welfare." *Id.* at 315.

In accordance with *Napleton*, we reject LMP's argument that in order to survive rational basis scrutiny, the challenged ordinance must have "a definite and substantial" relationship to a recognized police power. As stated by our supreme court in *Napleton*, a challenged zoning ordinance will survive rational basis scrutiny "if it bears a rational relationship to a legitimate legislative purpose and is neither arbitrary nor unreasonable." *Id.* at 319 (citing *Village of Lake Villa v. Stokovich*, 211 Ill. 2d 106 (2004)).

¶ 29    When Illinois courts apply the rational basis test, "a court must identify the public interest that the statute is intended to protect, examine whether the statute bears a reasonable relationship to that interest, and determine whether the method used to protect or further that interest is reasonable." *Arangold Corp. v. Zehnder*, 204 Ill. 2d 142, 147 (2003). A court's review under this standard is "limited" and " 'highly deferential.' " *Id.* Furthermore, under this test "mathematical precision" is not required and "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by the evidence or empirical data." (Internal quotation marks omitted.) *Cutinello v. Whitley*, 161 Ill. 2d 409, 421-22 (1994). Whether a statute is wise or the best way of achieving a stated end is left to the determination of the legislature. *Arangold Corp.*, 204 Ill. 2d at 147.

¶ 30 Like statutes, ordinances are presumed constitutional, and the opposing party bears the burden of rebutting this presumption. *American Federation of State, County, & Municipal Employees (AFSCME), Council 31 v. State*, 2015 IL App (1st) 133454, ¶ 19. This court must, whenever possible, construe a statute to uphold its constitutionality. *Id.* A party raising a challenge that an ordinance is facially unconstitutional bears the burden of establishing a clear constitutional violation. *Jackson v. City of Chicago*, 2012 IL App (1st) 111044, ¶ 20. Any doubts are resolved in favor of the challenged regulations. *Granite City Division of National Steel Co. v. Illinois Pollution Control Board*, 155 Ill. 2d 149, 164-65 (1993). Under these guidelines, a facial challenge represents "the most difficult challenge to mount successfully because an enactment is invalid on its face only if no set of circumstances exists under which it would be valid." *People v. One 1998 GMC*, 2011 IL 110236, ¶ 20. "The fact that the enactment could be found unconstitutional under some set of circumstances does not establish its facial invalidity." *Napleton*, 229 Ill. 2d at 306.

¶ 31 When LMP challenged the 200-foot rule, the City responded with three government objectives the rule is meant to further (1) strike a balance between brick-and-mortar restaurants and food trucks, (2) spread retail food options to underserved areas of the City, and (3) control sidewalk congestion in the applicable areas. If any one of these justifications is found to be sufficient, the ordinance will be upheld as constitutional. In arguing for reversal before this court, LMP asserts the 200-foot rule is unconstitutional because it is blatant protectionism and protecting brick-and-mortar restaurants from food truck competition is not a legitimate government interest.

¶ 32 We reject LMP's assertion that the City may not protect brick-and-mortar restaurants and uphold the 200-foot rule as a rational means of promoting the general welfare of the City of Chicago. Both the City and its expert testified that brick-and-mortar restaurants bring critical economic benefits to communities, including the payment of property taxes. Unlike brick-and-mortar restaurants, LMP and all food trucks do not pay property taxes or other assorted fees to the City that would be associated with the operation of a brick-and-mortar restaurant occupying real property in the City. Property taxes represent a key source of revenue for the City. The 200-foot rule seeks to protect those in the food service industry who pay and support the City's property tax base from those food businesses that do not. Moreover, brick-and-mortar restaurants also pay utility taxes, lease taxes, and, yes, even restaurant taxes. Chicago Municipal Code §§ 3-30-030 (added Nov. 19, 2003) (restaurant tax); 3-32-030 (amended Oct. 28, 2015) (lease tax); 3-53-020 (added June 10, 1998) (electricity use tax); and 3-80-040 (added Sept. 14, 2016) (water and sewer tax).

¶ 33 Illinois courts have previously found that it is completely rational for an Illinois municipality to favor businesses generating tax dollars over businesses that do not. In *Napleton*, a challenged zoning change prohibited "new depository or nondepository credit institutions from being located on the first floor of any building in the B-1 or B-3 zoning district." 229 Ill. 2d at 302. In upholding the validity of the ordinance, our supreme court stated:

> "[i]t was reasonable and legitimate for Hinsdale to conclude that the continued vitality of its business districts required an appropriate balance between businesses that provide sales tax revenue and those that do not, and its passage of the challenged amendments precluding new banks and financial institutions from locating on the

ground floors of buildings in the designated districts because they impose an opportunity cost in forgone tax revenue is rationally related to that purpose." *Id.* at 321. In the same line of reasoning, it is reasonable and legitimate for the City to conclude that continued receipt of property taxes and other city fees associated with running a brick-and-mortar restaurant "required an appropriate balance" with those food businesses that do not.

¶ 34 This proposition is not new and has been accepted as a legitimate and reasonable government action by previous courts. In *City of New Orleans v. Dukes*, the United States Supreme Court acknowledged that the City of New Orleans may ban pushcart food vendors from the city's historic French Quarter. 427 U.S. 297, 303 (1976). In upholding the ban under a rational basis review, the Court recognized the ban as a legitimate way for the city of New Orleans "to preserve the appearance and custom valued by the Quarter's residents and attractive to tourists." (Internal quotation marks omitted.) *Id.* at 304.

¶ 35 In *Vaden v. Village of Maywood*, the Seventh Circuit, applying Illinois law, upheld as a legitimate and rational exercise of municipal authority, a Village of Maywood ordinance, which restricted mobile food vending near schools. 809 F.2d 361 (7th Cir. 1987). As the Seventh Circuit pointed out, "distinctions between street vendors and merchants with a fixed place of business have been accepted by other courts in upholding similar ordinances against equal protection challenges."[3] *Id.* at 366. Cases like *Dukes*, *Napleton*, and *Vaden* establish that courts have long upheld city ordinances favoring one business over another under rational basis review.

¶ 36 As LMP admits, it seeks to overturn the 200-foot rule because its main affect is to prevent it from parking in areas close to a restaurant's front door where large amounts of potential customers gather. Notwithstanding LMP's license, which granted them the privilege to conduct business on the City's streets and sidewalks, LMP fails to recognize that while one has a constitutional right to pursue a profession (*Rios v. Jones*, 63 Ill. 2d 488, 496-97 (1976)), Illinois courts have long recognized that no individual or business has the constitutional right to conduct business from the city street or sidewalk. *City of Chicago v. Rhine*, 363 Ill. 619 (1936). The *Rhine* court dealt with a City ordinance that completely prohibited a person from selling newspapers in the Loop or Wilson Avenue districts. *Id.* at 620. In upholding the complete prohibition against the sale of newspapers in those areas, the court stated, "[Rhine] had no property right in the use of any of the streets of Chicago for the location and maintenance of his business." *Id.* at 625. Tellingly, LMP does not address *Rhine* or its progeny in either its opening or reply brief to this court.

¶ 37 The proposition that no individual has the constitutional property right to conduct business from the streets or sidewalks located within the state of Illinois has been reaffirmed several times since *Rhine*. In *Good Humor Corp. v. Village of Mundelein*, 33 Ill. 2d 252, 253-54 (1965), the Illinois Supreme Court upheld an ordinance, which prohibited all vending from the streets or sidewalks in the Village of Mundelein. Relying on *Rhine*, the court upheld the ordinance and found no due process violation because, "[t]he assumed property right upon

---

[3]While the court discusses this in terms of equal protection, the court had previously noted that whether framed as a due process or equal protection challenge, rational basis review applied. *Vaden*, 809 F.2d at 365.

which the plaintiff's case against the validity of the ordinance is based is nonexistent." *Id.* at 259 (citing *Rhine*, 363 Ill. at 625).

¶ 38    In *Triple A Services, Inc. v. Rice*, 131 Ill. 2d 217, 221-22 (1989), our supreme court was confronted with a Chicago ordinance that banned mobile food trucks from selling within the Medical District. After upholding the ordinance under a rational basis review, our supreme court again reiterated that no individual has the right to use streets or sidewalks for private gain. *Id.* at 229. The *Triple A Services, Inc.*, court further recognized that Chicago's ability to regulate its streets and sidewalks had become even more evident since the *Rhine* decision because of the adoption of the 1970 Constitution and the introduction of "home rule." *Id.* at 230 (citing Ill. Const. 1970, art. VII, § 6). Under article VII, section 6, Chicago had the "same powers as the sovereign, except where such powers are limited by the General Assembly." *Id.*

¶ 39    In accord with *Rhine*, *Good Humor Corp.*, and *Triple A Services, Inc.*, we reiterate that no individual or business has a constitutional property right to use Chicago's streets and sidewalks for private gain. It is only through the issuance of a license that plaintiff may conduct business on the City streets. The issuance of said license did not create a vested property right but rather a "revocable privilege to do an act or a series of acts upon the land of another without possessing any estate or interest in such land." *Grigoleit, Inc. v. Board of Trustees of the Sanitary District of Decatur*, 233 Ill. App. 3d 606, 612 (1992) (citing *City of Berwyn v. Berglund*, 255 Ill. 498, 500 (1912)). As plaintiff acknowledged at oral argument, the City could outright ban all food trucks from operating on the city streets. The issuance of a license to operate on the city street did not abrogate the City's power to legislate for the general welfare, and "[i]t is presumed, absent unequivocal language, that a city, in granting a license, reserves the ability to exercise its police power and place additional regulatory burdens on license holders." (Internal quotation marks omitted.) *Triple A Services, Inc.*, 131 Ill. 2d at 235.

¶ 40    While LMP points out the main thrust of the 200-foot rule is to prohibit street parking, it also points to at least two instances where the 200-foot rule prohibits it from operating on private property. Yet this fact does not render the 200-foot restriction unconstitutional. LMP has raised a facial challenge to the constitutionality of the 200-foot rule, and this court will only sustain a facial challenge "if no set of circumstances exists under which it would be valid." *Napleton*, 229 Ill. 2d at 306. "The fact that the enactment could be found unconstitutional under some set of circumstances does not establish its facial invalidity." *Id.* (citing *Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 504 (1982)). Significantly, courts are to give "wide latitude" to the states "in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude." *Dukes*, 427 U.S. at 303. For this reason, LMP's argument concerning the incidental effect of the 200-foot rule does not support its facial invalidity.

¶ 41    We also find all of the cases relied upon by LMP to be readily distinguishable from the facts of this case and do not support a finding of facial invalidity. In attacking the 200-foot rule, LMP relies primarily on *Chicago Title & Trust Co. v. Village of Lombard*, 19 Ill. 2d 98 (1960), a case involving a proximity restriction between existing and new gas stations. In *Chicago Title*, our supreme court invalidated a Village of Lombard ordinance that prevented the establishment of any new gas station within 650 feet of any existing gas station. *Id.* at 100. While proposed on the basis of safety, the reviewing court found the fact that new stations could be built within 150 feet of schools, hospitals, and churches completely undermined the

claim of safety. *Id.* at 104. Additionally, the rule had no effect on those stations within 650 feet already in existence. *Id.* at 106-07. Therefore, the court found no rational basis for the safety concerns. *Id.* at 107. Unlike *Chicago Title*, the restriction at issue in this case was not proffered solely based on safety and does not favor existing food trucks over new truck competitors.

¶ 42 *Chicago Title* is distinguishable for several other reasons. *Chicago Title* was decided before the 1970 Illinois Constitution and the implementation of home rule. As explained in *Triple A Services Inc.*, the home rule provision dramatically altered Chicago's authority, and it can now act with the "same powers as the sovereign." *Triple A Services, Inc.*, 131 Ill. 2d at 230. Notably, the court in *Triple A Services, Inc.*, also rejected plaintiff's attempt to rely on non-home rule case law. *Id.* at 231 (citing *Rocking H. Stables, Inc. v. Village of Norridge*, 106 Ill. App. 2d 179 (1969)). Besides not addressing home rule, *Chicago Title* is also distinguishable because the plaintiff in that case sought to use a piece of real property. 19 Ill. 2d at 106-07 (denies to plaintiffs the right to use their property as a gas station). Unlike the private real property at issue in *Chicago Title*, LMP seeks to make use of Chicago's streets and sidewalks for its own private gain. As previously stated, LMP has no property right to use the streets and sidewalks for its own private gain. *Rhine*, 363 Ill. at 625.

¶ 43 LMP claims that *Chicago Title* stands for the proposition that proximity based restrictions that "promote monopoly" are inherently suspect. See *Chicago Title*, 19 Ill. 2d at 107 ("[i]t exempts from its requirements businesses already established, and, in operation and effect, tends to promote monopoly"). LMP argues that the 200-foot restriction promotes a monopoly because it prevents it from "vending in the vast majority of the Loop" and reduces competition. As previously stated, LMP and all food trucks have no constitutional property right to conduct any private business from the streets or sidewalks of Chicago. *Rhine*, 363 Ill. at 625. Moreover, LMP appears to take the position that the 200-foot restriction promotes a monopoly by the brick-and-mortar restaurants regardless of who actually owns them. Black's Law Dictionary defines monopoly as "[c]ontrol or advantage obtained by *one supplier or producer* over the commercial market within a given region." (Emphasis added.) Black's Law Dictionary (10th ed. 2014). LMP presents no evidence, nor does this court expect it could, that brick-and-mortar restaurants are controlled by one supplier or producer. LMP's claim that the rule supports a monopoly has neither a basis in law or fact and is rejected by this court.

¶ 44 LMP also argues that Illinois may not discriminate against two different business models and cites *Exchange National Bank of Chicago v. Village of Skokie*, 86 Ill. App. 2d 12 (1967). In *Exchange National*, plaintiff was denied a special use permit to open an automated car wash. *Id.* at 13-14. While the court reversed the denial of the permit as arbitrary and unreasonable, it stated in *dicta* that the village did not have the municipal authority to legislate "economic protection for existing businesses against the normal competitive factors which are basic to our economic system." *Id.* at 21.

¶ 45 *Exchange National*, like *Chicago Title*, is a pre-1970 case and does not deal with home rule authority. This alone undercuts the weight to be given to it. Equally as important, the case simply does not support LMP's position. In making its argument, LMP willfully fails to recognize that it is not the same business as a brick-and-mortar restaurant. Unlike *Exchange National*, this is not a case where there are two similar business, one automated and one not, both seeking to permanently operate from private real property. LMP does not seek to permanently conduct its bakery business from a brick-and-mortar establishment in Chicago

using automated techniques, and the 200-foot rule it seeks to invalidate does not prevent it from so doing. Accordingly, *Exchange National* does not support LMP's position.

¶ 46    The other cases relied upon by LMP also involved the use of private real property and are therefore distinguishable from the case currently before the court. A case relied upon by LMP, *Cosmopolitan National Bank v. Village of Niles*, 118 Ill. App. 3d 87 (1983), involved a piece of real property. See *id.* at 88-89 (noting the issue before the court was the denial of a special use permit to operate a McDonald's restaurant). It is further distinguished by the fact that the plaintiff in *Cosmopolitan National Bank* did not seek to invalidate any Niles ordinance. LMP also relies on *Church*, but that case involved licensures and whether the legislature could require practical experience as a prerequisite for issuing a license to become a private alarm installer. 164 Ill. 2d at 167-68. LMP does not claim it has been denied a license because it lacks experience in the food truck business, so its reliance on this case is misplaced.

¶ 47    Based on the above, LMP has failed to establish that the 200-foot restriction is arbitrary and unreasonable as having no relation to the City's authority to promote its general welfare. Accordingly, the circuit court's order granting summary judgment in favor of the City as to the 200-foot restriction is affirmed.[4]

¶ 48    LMP next argues the requirement that it install a GPS unit in its truck and transmit its location to a service provider represents a warrantless search in violation of article I, section 6, of the Illinois Constitution. Under the challenged municipal provision, each food truck "shall be equipped with a permanently installed functioning [GPS] device which sends real-time data to any service that has a publicly-accessible application programming interface." Chicago Municipal Code § 7-38-115(l) (amended July 25, 2012). An applicable board of health rule explains that the GPS device need only transmit location data "while the vehicle is vending food or otherwise open for business to the public, and when the vehicle is being serviced at a commissary." Chicago Board of Health, Rules and Regulations for Mobile Food Vehicles, R. 8(A)(4) (eff. Aug. 7, 2014).

¶ 49    Section 6, of article I, of the Illinois Constitution states:

> "The people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches, seizures, invasions of privacy or interceptions of communications by eavesdropping devices or other means. No warrant shall issue without probable cause, supported by affidavit particularly describing the place to be searched and the persons or things to be seized." Ill. Const. 1970, art. I, § 6.

We note that "the protection against unreasonable searches and seizures under the Illinois Constitution is measured by the same standards as are used in defining the protections contained in the fourth amendment to the United States Constitution." *People v. Thomas*, 198 Ill. 2d 103, 109 (2001).

¶ 50    LMP contends that the GPS requirement constitutes a "search" pursuant to *Jones*, 565 U.S. 400. In the *Jones* case, the FBI suspected the defendant of drug trafficking and obtained a warrant authorizing the installation of a GPS on defendant's car within 10 days. *Id.* at 402-03. The government installed the GPS device on the eleventh day. *Id.* at 403. The government eventually obtained an indictment and was permitted to use the data collected while defendant

---

[4]Because we uphold the 200-foot rule as a reasonable exercise of the City's power to protect businesses paying property tax over those that do not, we decline to address whether the other proffered reasons would also support the constitutionality of the 200-foot restriction.

moved about the city streets. *Id.* The United States Court of Appeals for the District of Columbia reversed the conviction because the use of the GPS device violated the fourth amendment. *Id.* at 404. On appeal, the United States Supreme Court concluded that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.' " *Id.* In reaching this conclusion, the Court stated "[t]he Government physically occupied private property for the purpose of obtaining information. We have no doubt that such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted." *Id.* at 404-05 (citing *Entick v. Carrington* (1765) 95 Eng. Rep. 807).

¶ 51  The Court reaffirmed this holing in *Florida v. Jardines*, 569 U.S. 1, 5-7 (2013). In *Jardines*, the Court held that having a drug-sniffing dog nose around a suspect's front porch was a search because the police had "gathered information by physically entering and occupying the [curtilage of the house] to engage in conduct not explicitly or implicitly permitted by the homeowner.*" Id.* at 6. Then in *Grady v. North Carolina*, 575 U.S. ___, 135 S. Ct. 1368 (2015), the Court found that North Carolina's program of attaching GPS devices to recidivist sex offenders implicated the fourth amendment. Following on *Jones* and *Jardines*, the Court stated, "it follows that a State also conducts a search when it attaches a device to a person's body." *Id.* at ___, 135 S. Ct. at 1370.

¶ 52  Based upon *Jones*, *Jardines*, and *Grady*, we reject LMP's claim that the GPS requirement at issue constitutes a search. No search occurred because the City has not physically trespassed on LMP's property. The key issue in the Court's finding that a search had occurred in the above cases was the *state's physical occupation* of property (*Jones*, 565 U.S. at 404; *Jardines*, 569 U.S. at 6) or the *state's physical intrusion* on the subject's body (*Grady*, 575 U.S. at ___, 135 S. Ct. at 1371). LMP never alleged the City physically entered its mobile food truck to place the device, nor does it allege the device is City property. Because there is no trespass, no search occurred within the context of *Jones*.

¶ 53  Normally, our inquiry would not end with the above. Pursuant to *Katz v. United States*, a search may also occur when the government intrudes on an individual's "reasonable-expectation-of-privacy." *Jones*, 565 U.S. at 409 (citing *Katz v. United States*, 389 U.S. 347 (1967)). However, LMP makes no argument concerning its "reasonable expectation of privacy" and we decline to engage in any analysis absent a properly raised argument by appellant. Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016) (points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing).

¶ 54  This case resembles *Grigoleit*, 233 Ill. App. 3d 606 (1992). Grigoleit discharged its industrial wastewater into the sanitary district's publicly owned water pipes. *Id.* at 608. The ordinance under which this was allowed also required Grigoleit to allow the district access to all discharge locations. *Id.* at 609. Grigoleit refused all such requests for inspection, and the district revoked Grigoleit's license to discharge. *Id.* at 610. The circuit court reinstated the permit, and the district appealed to this court. We reversed the circuit court and reinstated the board's decision to revoke Grigoleit's license. *Id.* at 610-11. In so doing, this court stated, "Grigoleit is not in this instance subject to a regulatory scheme purporting to regulate the internal conduct of its business activities." *Id.* at 611. "Grigoleit instead is subject to regulation which controls the external disposal of wastewater it has generated onto property in which it possesses no interest." *Id.* at 612. We continued "[i]t has long been settled that a license in

respect of real property, either oral or written, is a revocable privilege to do an act or a series of acts upon the land of another without possessing any estate or interest." *Id.*

¶ 55 We concluded that Grigoleit had no "constitutionally protected interest in the sewer connection and may not accept the privileges afforded by the license while simultaneously raising the fourth amendment as a bar to enforcement of the very conditions upon which extension of the license is predicated." *Id.* at 613. As the court succinctly concluded, "[i]f Grigoleit chooses to withhold consent to inspection (as it did here), the permit may be revoked and no inspection takes place—there is no entry of Grigoleit's facility and there is no search implicating the fourth amendment." *Id.* at 614.

¶ 56 The same logic applied by this court in *Grigoleit* applies equally well here. Grigoleit and all other dischargers had no constitutional right to discharge waste into the district's water network. *Id.* at 613. Similarly, LMP and all food trucks have no constitutionally protected property right in conducting business from Chicago's streets or sidewalks. *Rhine*, 363 Ill. at 625. Like the conditions surrounding the district's issuance of discharge licenses, the GPS requirement at issue is a condition precedent that LMP and all food trucks must comply with to obtain a license to sell on the City streets or sidewalks. Like the ordinance in *Grigoleit*, the ordinance at issue here does not regulate the internal conduct of LMP's business activities. *Id.* at 611-12 (citing *New York v. Burger*, 482 U.S. 691, 702 (1987)). LMP makes no argument that the GPS requirement affects or regulates the internal operations of its bakery business. In accepting a license to conduct business from the City street, LMP cannot raise a fourth amendment challenge to "bar *** enforcement of the very conditions upon which extension of the license is predicated." *Id.* at 613.

¶ 57 In view of the above, we affirm the circuit court's finding that the GPS requirement does not constitute a search within the meaning of the Illinois Constitution or the fourth amendment to the United States Constitution.

¶ 58                                  CONCLUSION

¶ 59 For the foregoing reasons, both the 200-foot restriction and the GPS requirement are constitutionally valid. The decision of the circuit court is affirmed.

¶ 60 Affirmed.