NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 190887-U

NO. 4-19-0887

IN THE APPELLATE COURT

FILED
June 26, 2020
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| DESHERLIA MARINA MANAGEMENT, INC., | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Jersey County |
| CITY OF GRAFTON, an Illinois Municipal Corporation, | ) | No. 19MR42 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Joshua Aaron Meyer, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Presiding Justice Steigmann and Justice Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court reversed, finding the trial court erred in granting a preliminary injunction where the plaintiff failed to demonstrate it had a protectable interest in land owned by the defendant municipal corporation.

¶ 2        Plaintiff, DeSherlia Marina Management, Inc. (DeSherlia), has operated a marina business (Grafton Harbor) pursuant to a lease agreement with defendant, City of Grafton (the City), since 2002. Grafton Harbor, which is located on the Mississippi River, was developed as part of a plan for urban development (PUD) approved by the City. Between 2007 and 2008, DeSherlia installed a portable shed building and a fence on certain other City property (individually, Lots 11 and 12, and Elm Street; collectively, other City property) that was not included in the lease. In 2015, the City filed a lawsuit seeking to evict DeSherlia and demanding it remove the shed and fence from the other City property. The City later voluntarily dismissed the lawsuit to resolve its issues with DeSherlia outside of court.

¶ 3        In May 2019, DeSherlia filed a two-count complaint seeking a declaratory judgment to determine, *inter alia*, whether it was authorized to continue using the other City property. In count II, DeSherlia sought provisional relief—specifically, a preliminary injunction—allowing it to continue using the other City property during the pendency of the litigation.

¶ 4        Following hearings in September and October 2019, the trial court issued a preliminary injunction granting DeSherlia the right to continue using the other City property, including the right to reinstall the fence and a shed that DeSherlia had previously placed on the other City property.

¶ 5        On December 17, 2019, the City filed a notice of interlocutory appeal pursuant to Illinois Supreme Court Rule 307(a)(1) (eff. Nov. 1, 2017), arguing the trial court erred in granting the preliminary injunction. For the following reasons, we reverse the trial court's judgment.

¶ 6                                I. BACKGROUND

¶ 7                                A. The Complaint

¶ 8        On May 3, 2019, DeSherlia filed a complaint for a declaratory judgment and other relief. The complaint alleged within the past few years, "the parties have entered into certain other agreements in which [DeSherlia] was authorized to place a portable building/shed on site for use by [DeSherlia's] business in addition to a fence." DeSherlia further alleged the City has "refused to recognize that [DeSherlia] has a) legal possession of certain lots at Grafton Harbor, b) authorized installation of a fence, and c) authorization to have a portable building on site." DeSherlia also alleged the mayor of the City, Eric (Rick) T. Eberlin, "has engaged in an ongoing effort to harass and obstruct [DeSherlia's] business activities, including conducting unannounced and unnecessary inspections, contacting governmental agencies to make misrepresentations about [DeSherlia's] business, encouraging litigation against [DeSherlia] by governmental agencies for alleged grant

- 2 -

violations, and making statements to local media accusing [DeSherlia] and its owners of various acts of misconduct."

¶ 9 In support of its request for a declaratory judgment, DeSherlia alleged the parties had an "ongoing controversy regarding:

   a) Whether [DeSherlia] has legal possession of all lots within its lease and PUD;

   b) Whether [DeSherlia] has authorization for the installation of a fence and portable building;

   c) Whether [DeSherlia] must consent to endless inspections by [the City] and which, if any, inspections [DeSherlia] must permit;

   d) Whether [DeSherlia] must leave its bathrooms open to the general public at all times;

   e) Whether [DeSherlia] must provide [the City] with any writing regarding the fuel docks and surrounding area;

   f) Whether [DeSherlia] is paying the correct amount of rent;

   g) Any other interpretations of the agreements of the parties and rights and obligations of [DeSherlia] to the [City] relating to the operation and use of Grafton Harbor."

¶ 10 In its request for a preliminary injunction, DeSherlia alleged the City "has posted no trespassing signs and tow notices on the lots [DeSherlia] is using in an attempt to harass and intimidate [DeSherlia] by indirectly threatening arrest or loss of property if [DeSherlia] continues to use the very property [DeSherlia] has been using with [the City's] knowledge and consent for years." DeSherlia further alleged: (1) it has a clearly protectable right in that it has been using the

other City property for many years, and the use of that property is important to its business; (2) it has no adequate remedy at law other than to seek a declaration from the court; (3) it has demonstrated a likelihood of success on the merits "given [the City's] longtime consent to [DeSherlia's] use of [the other City property], [the City's] approval for the fence, [the City's] approval of the portable building, and the inclusion of [the other City property]" in the City's PUD; and (4) an injunction allowing DeSherlia to continue using the other City property is in the public interest.

¶ 11          B. Motion for Temporary Restraining Order or Preliminary Injunction

¶ 12          On August 23, 2019, DeSherlia filed a motion for temporary restraining order or preliminary injunction, alleging substantially the same claims for relief. DeSherlia attached to the petition the affidavit of its owner, Joseph ("Joe") DeSherlia. In the affidavit, Joe averred that several weeks after filing the complaint for declaratory judgment and other provisional relief, the City issued DeSherlia an ordinance violation "for the alleged presence of the fence and the shed." He further averred that one week prior to filing the motion for temporary restraining order or preliminary injunction, the City sent a letter to DeSherlia "attempting to terminate the lease agreement citing several issues, most of which are pending before the court in [the] complaint" and refused to allow DeSherlia to repair the fence or reinstall the shed, which caused disruption to the business.

¶ 13          C. Preliminary Injunction and Temporary Restraining Order Hearing

¶ 14          On September 24, 2019, the trial court conducted a hearing on DeSherlia's request for provisional relief.

¶ 15                         1. *DeSherlia's Case*

¶ 16                         a. Joseph DeSherlia

- 4 -

¶ 17        Joe DeSherlia testified he is the owner and primary shareholder of DeSherlia. DeSherlia is currently a tenant of certain real estate owned by the City where it operates the marina business known as Grafton Harbor. Joe testified Grafton Harbor consists of a transient harbor, covered docks for boat owners to rent, a fuel dock, winery, gift shop, restaurant, and boat rentals. DeSherlia entered into a 98-year lease agreement with the City to develop the marina in 2001. At that time, the mayor of the City was Richard Mosby.

¶ 18        Joe testified that when he began construction on the marina, the business struggled with space issues for storage and office purposes, so he purchased a portable shed building. Joe originally placed the shed in a parking lot owned by the City, but he was later directed by the City council to keep the shed on Elm Street, which Joe described as an unpaved road. According to Joe, Elm Street is where his "utilities run so the [shed] sits right on top of [his] utility easement."

¶ 19        DeSherlia then introduced Plaintiff's Exhibit A, which consisted of a building permit dated March 8, 2008. Joe testified he was instructed by the City to apply for a building permit for his shed and the permit was granted. The permit was signed by Dennis Day, who was the building and zoning officer of the City at the time. Joe testified that on two occasions he had to move the shed to a different location due to flooding. On the most recent occasion, he was not able to reinstall the shed at the Elm Street location because DeSherlia was "threatened by the City that [it] would be trespassing if [it] put the shed back *** where it came from." Joe testified that prior to this, he had kept the shed at the Elm Street location for 10 or 12 years and "nobody said anything about it." Joe testified that he used the shed to store welding equipment, pesticides, various "chemicals" for the docks, paint, hand tools, and electrical equipment. Joe said these items were "necessary" for the business.

¶ 20        Since he was unable to reinstall the shed, some items were sitting outside in the elements and other items were being stored inside the marina's limited office space. Joe testified that not having access to the shed was very disruptive to the day-to-day operation of his business and because of having "everything in disrepair, sitting out all over the place," the marina risked losing its prestigious status as a "five-star, five-anchor" marina, of which there are only 23 in the country.

¶ 21        DeSherlia then introduced Plaintiff's Exhibit B, which was another building permit dated February 23, 2007. Joe testified the building permit was granted by the City for DeSherlia to install a fence. Joe testified that in December 2013, then-mayor Tom Thompson asked him to enlarge the fence and "keep all [his] stuff" within it, including the shed. DeSherlia then introduced Plaintiff's Exhibit C, which was a handwritten note from Thompson to Joe, stating, "Joe, I appreciate your efforts to cover your building materials at the marina from public view. Please proceed with the fence. Tom Thompson." The exhibit was admitted over the City's objection. Joe testified that due to recent flooding, some fence panels were knocked down and "just *** sitting there," "basically in a state of disrepair." The City had placed no trespassing signs around the area and issued him a stop work order when he attempted to repair the fence. Joe testified he was worried he would receive an ordinance violation from the City if he attempted to repair the fence again. Joe testified Lots 11 and 12 and Elm street were not included in his lease agreement with the City but he believed they were intended for use by Grafton Harbor based on the PUD.

¶ 22        On cross-examination, Joe testified Elm Street and Lots 11 and 12 are public property owned by the City. Joe testified that if he is unable to keep the shed building at its current location, the biggest issues would be "damage to equipment being left out in weather, not having electricity, not having water."

¶ 23                               b. Richard Mosby

¶ 24        Richard Mosby testified he was the mayor of Grafton between 2001 and 2009 and was familiar with the lease agreement DeSherlia had with the City. He was the mayor of Grafton when DeSherlia requested building permit applications for the fence and the shed. According to Mosby, "after some discussion the [City] council agreed to allow [DeSherlia] to put the shed on Elm Street." Mosby testified it was his "understanding and still is that *** [the City council] voted to vacate that section of Elm Street" and that is why DeSherlia put the shed there. Mosby did not know whether any "follow-up steps were taken" to "put it on public record" the City's decision to vacate Elm Street as a public right-of-way. When asked whether the City council had taken any action regarding the fence, Mosby testified, "I would say we approved it." During his time as mayor, it was Mosby's understanding that "the City had granted [DeSherlia] permission to have the shed and fence" on the other City property. Mosby further testified that the other City property was "part of the original PUD" and the City council intended the "entire PUD area be available" to DeSherlia. To Mosby's knowledge, DeSherlia was the only entity that had occupied the PUD area since it was approved. At the conclusion of Mosby's testimony, the hearing was continued.

¶ 25                                c. John Taylor

¶ 26        The proceedings resumed on October 30, 2019. John Taylor testified he has been a registered professional engineer for 40 years. At some point in 2018, Taylor was asked by the parties in this case to act as a mediator, but the mediation was unsuccessful. According to Taylor, Elm Street was a platted street but had never been used as a public roadway. Taylor testified DeSherlia had an easement to access the utilities, which were located along Elm Street, but the area was not included in the legal description of DeSherlia's lease. However, Taylor agreed Lots 11 and 12 were "included in part of [the] overall PUD" for Grafton Harbor.

¶ 27                                    d. Jim Spencer

¶ 28          Jim Spencer testified he is an alderman for the City representing the third ward and has been a member of the City council for three and a half years. When Spencer was elected alderman, there was already a lawsuit between the parties pending, but it was voluntarily dismissed by the City sometime in 2018. Spencer testified he and Mayor Eberlin decided to pursue mediation with DeSherlia in order to resolve the parties' ongoing issues. Spencer spent "approximately three months" working with the State's Attorney, Ben Goetten, and the City Attorney, Jim Schrempf, "to mediate or attempt to mediate and resolve these outstanding issues." Spencer testified they came up with a resolution which was presented to the City council. The resolution failed by a 5-2 vote; despite a majority of votes in favor, this particular resolution required a supermajority to pass. Mayor Eberlin and one other alderman were in the minority.

¶ 29          Spencer testified he was familiar with DeSherlia's use of its fence and shed and "[a]bsolutely" "believe[d] these items are necessary to [the] business." Spencer testified DeSherlia attempted to repair the fence but was issued a stop work order from the City. With respect to the issue of restoring the shed to its prior location, Spencer testified "that's basically the only logical place to have the fence and the shed due to the fact that that's where all the utilities are located, the pump out, water, electricity ***." Furthermore, "there's equipment in [the shed] that requires *** that with being this cold right now that could freeze without electricity to provide heat *** in the shed." DeSherlia currently stored the equipment elsewhere on site but did not have access to utilities in that location.

¶ 30          Spencer testified that since becoming alderman, he encountered issues when submitting Freedom of Information Act (FOIA) requests from the City. In particular, Spencer

found "gaps in the record" such as lack of permits for certain construction projects and improvements.

¶ 31 On cross-examination, Spencer testified DeSherlia had a place on its own property to keep the shed, but there were "no utilities" and "[i]t would just be more convenient for [DeSherlia] to have it where *** it used to be located on Elm Street."

¶ 32                                    2. *The City*

¶ 33                                    a. Charlie Juno

¶ 34 Charlie Juno testified for the City. Juno testified he is a civil engineer and land surveyor and had worked in that capacity for 48 years. Juno was involved in the development and consideration of the PUD for Grafton Harbor and was familiar with the boundaries of the lease agreement between the City and DeSherlia. The lease agreement was then admitted into evidence as Defendant's Exhibit B. Juno testified the lots where the fence and shed were located were "outside the boundary of the lease." Furthermore, Juno stated that to his knowledge, Elm Street had never been vacated by the City. In order to vacate a public street, "[i]t would take an ordinance by the village or city ***." Juno was not aware of any such ordinance with respect to Elm Street. The City then introduced Defendant's Exhibit D, which was a copy of Grafton Ordinance No. 523, "approving a special use permit for a planned unit development of Grafton Harbor ***." In comparing the ordinance with the lease agreement, Juno testified the legal descriptions of the real estate comprising the PUD were the same in both. According to Juno, the shed that was on Elm street and the fence on Lots 11 and 12 were not included in the legal description of either the ordinance or the lease agreement. Juno testified he was not aware of any amendments to the ordinance and nothing in the ordinance granted DeSherlia the use of any City property outside of the leased area.

¶ 35        On cross-examination, DeSherlia introduced Plaintiff's Exhibit No. 6, which contained a copy of Grafton Ordinance No. 535, approving "a vacation of Elm Street from Columbia Street to the north line of Clinton Street." DeSherlia then introduced Plaintiff's Exhibit No. 7, which contained a copy of the Code of Ordinances of the City of Grafton. Juno admitted that the ordinance book did not contain Ordinance No. 535, but rather skipped from Ordinance No. 534 to Ordinance No. 536. On redirect, Juno testified that Ordinance No. 535 did not vacate the portion of Elm Street involved in the instant dispute.

¶ 36                          b. Rick Eberlin

¶ 37        Rick Eberlin testified he is currently the mayor of Grafton and, since being elected, had reviewed City council meeting minutes dating back to 2001. Eberlin testified the City council had never approved an ordinance allowing DeSherlia to use Lots 11 and 12 or vacating Elm Street. Eberlin further testified he had received complaints from members of the community regarding the condition of DeSherlia's fence and shed building.

¶ 38        On cross-examination, Eberlin testified that during his time as mayor, he had on one occasion discovered City council minutes to be missing; however, in that instance, the minutes were returned by the City council member who had taken them.

¶ 39        At the conclusion of evidence, the trial court directed the parties to submit closing arguments in writing and took the matter under advisement.

¶ 40                          D. Trial Court's Order

¶ 41        On December 2, 2019, the trial court entered a written order granting DeSherlia's request for preliminary injunction, which stated:

          "DeSherlia is granted the use of the lots 11 and 12 in Block 1 in the City of

          Grafton, in addition to the area to the immediate east of Lot 12 where DeSherlia

- 10 -

has kept a portable building for the past several years. DeSherlia may reinstall the portable building, repair the fence, and otherwise use and maintain the area until further order of this Court. DeSherlia remains liable for the maintenance of this area and shall be responsible for the removal of the portable shed and DeSherlia's other personal properties should this injunction be dissolved."

¶ 42 In granting the preliminary injunction, the trial court found DeSherlia raised a fair question that it had a clearly ascertainable right to its continued use of the other City property based on the doctrine of equitable estoppel, as "established by the [C]ity's express authorization during Mayor Mosby's term and continued allowance for a number of years following the initial authorization." The court further found DeSherlia raised a fair question that (1) it would suffer irreparable injury without the injunction, (2) it had no adequate remedy at law, (3) it had a likelihood of success on the merits, and (4) the balance of equities favored granting the injunction. The court denied DeSherlia's request for provisional relief on the harassment claim.

¶ 43 This appeal followed.

¶ 44 II. ANALYSIS

¶ 45 On appeal, the City argues the trial court erred in granting the preliminary injunction because DeSherlia failed to present sufficient evidence to raise a fair question as to any of the four factors necessary for injunctive relief. DeSherlia maintains it raised a fair question as to all of the aforementioned issues and the trial court did not abuse its discretion in granting the preliminary injunction. We agree with the City.

¶ 46 A. Preliminary Injunction Standard

¶ 47 To establish entitlement to preliminary injunctive relief, a plaintiff must show (1) a clearly ascertainable right in need of protection, (2) irreparable harm without protection of that

right, (3) no adequate remedy at law, and (4) a substantial likelihood of success on the merits of the underlying action. *Caro v. Blagojevich*, 385 Ill. App. 3d 704, 708, 895 N.E.2d 1091, 1096 (2008). The failure to establish any one of these elements requires the denial of the preliminary injunction. *Yellow Cab Co. v. Production Workers Union of Chicago & Vicinity, Local 707*, 92 Ill. App. 3d 355, 356, 416 N.E.2d 48, 50 (1980).

> "An applicant for a preliminary injunction need not make out a case which will entitle him to the ultimate relief he seeks, but need only raise a fair question as to the existence of the right claimed, making it appear advisable that the positions of the parties should remain the same until the court has an opportunity to consider the case on its merits." *Cameron v. Bartels*, 214 Ill. App. 3d 69, 73, 573 N.E.2d 273, 275 (1991).

¶ 48 On review of a trial court's grant or denial of a preliminary injunction, the appellate court may not decide controverted questions of fact or the merits of the case. *American National Bank & Trust Co. of Chicago v. Chicago Title & Trust Co.*, 134 Ill. App. 3d 772, 777, 481 N.E.2d 71, 74 (1985). Generally, we review a trial court's grant or denial of a preliminary injunction for an abuse of discretion. *Clinton Landfill, Inc. v. Mahomet Valley Water Authority*, 406 Ill. App. 3d 374, 378, 943 N.E.2d 725, 729 (2010). However, "where the trial court does not make any factual findings and rules on a question of law, the appellate court's review is *de novo*." *Makindu v. Illinois High School Ass'n*, 2015 IL App (2d) 141201, ¶ 32, 40 N.E.3d 182. Accordingly, this court will defer to the trial court's findings of fact but review any legal issues *de novo*.

¶ 49 B. Clearly Ascertainable Right in Need of Protection

¶ 50 The City first contends the trial court erred in granting the preliminary injunction because DeSherlia failed to establish it has a clearly ascertainable right to reinstall a shed and fence

on the other City property. DeSherlia responds it raised a fair question as to this right because the evidence presented at the hearing showed (1) the City previously issued DeSherlia building permits for both the shed and the fence and (2) former Mayor Mosby testified he expressly authorized DeSherlia to use the other City property and that the City council, at some point, voted to vacate Elm Street for DeSherlia's use. DeSherlia further argues that, even if it did not have a contractual or real property interest in the other City property, the evidence was sufficient to raise a fair question as to this right based on the theories of (1) an irrevocable license or (2) equitable estoppel. We discuss each possible theory in turn.

¶ 51        To show a clear and ascertainable right, the party seeking the injunction must raise a fair question that it has a substantive interest recognized by statute or common law. *Delta Medical Systems v. Mid-America Medical Systems, Inc.*, 331 Ill. App. 3d 777, 788-89, 772 N.E.2d 768, 779 (2002).

¶ 52                            1. *Contractual or Real Property Interest*

¶ 53        Here, the parties do not dispute the lease agreement did not include any provision granting DeSherlia the right to use or occupy the other City property. Accordingly, we agree with the City that DeSherlia cannot claim any interest in the other City property based solely on its lease agreement or the original City ordinance (City of Grafton Ordinance No. 523) approving the lease agreement.

¶ 54        The City further argues the City never passed any other ordinance that would grant DeSherlia the right to install the shed or fence. DeSherlia counters former Mayor Mosby's testimony showed the City Council, at some point, "expressly authorized [DeSherlia's] use of the [other City] property" and "vote[d] to vacate the portion of Elm Street used by [DeSherlia]."

¶ 55        Section 11-76-1 of the Illinois Municipal Code (Municipal Code) (65 ILCS 5/11-76-1 (West 2018)) provides the mechanism by which a municipal corporation, such as the City, may lease or convey an interest in its real property. Specifically, the statute provides, "This power shall be exercised by an ordinance passed by three-fourths of the corporate authorities of the city or village then holding office, at any regular meeting or at any special meeting called for that purpose." *Id.* The appellate court has held these requirements are mandatory: "[T]he power *must* be exercised by ordinance and it *must* be approved by a three-fourths vote." (Emphases added.) *Samios v. City of Joliet*, 101 Ill. App. 2d 210, 212, 242 N.E.2d 322, 324 (1968). Moreover, the Municipal Code provides the following method to prove the contents of a valid ordinance:

> "The municipal clerk shall record, in a book used exclusively for that purpose, all ordinances passed by the corporate authorities. Immediately following each ordinance the municipal clerk shall make a memorandum of the date of the passage and of the publication or posting, where required, of the ordinance. This record and memorandum, or a certified copy thereof, shall be *prima facie* evidence of the contents, passage, and of the publication or posting of ordinances." 65 ILCS 5/1-2-5 (West 2018).

¶ 56        Here, there is nothing in the record to support DeSherlia's right to use the other City property based on a valid ordinance. At the hearing, DeSherlia presented evidence from former Mayor Mosby who testified the City council authorized DeSherlia's use of the other City property and voted to vacate a portion of Elm Street for DeSherlia's use. While we generally defer to the trial court's determinations of witness credibility, we find that even assuming former Mayor Mosby's testimony is credible, the parties do not dispute DeSherlia did not produce a valid City ordinance showing that such a vote was held and that the ordinance was passed. This is further

buttressed by conflicting testimony from the current mayor who indicated a review of all city council meeting minutes recorded during the relevant time period revealed no mention of such discussion or vote. In reaching this conclusion, we do not claim to resolve the ultimate factual issue as to whether such an ordinance was passed or not passed; rather, we merely find DeSherlia's failure to produce the ordinance precludes a finding that DeSherlia raised a *fair* question as to its right to use the other City property based on the passage of a valid ordinance. None of the evidence presented by DeSherlia rises to the level required to claim a lawful interest in city property. The belief of a former mayor, which is refuted by the actual municipal record, coupled with some non-specific building permits is not likely, under any set of circumstances, to suffice under Section 11-76-1 of the Municipal Code.

¶ 57        We next turn to whether DeSherlia raised a fair question as to a clearly ascertainable right on the theory of an irrevocable license.

¶ 58                                2. *Irrevocable License*

¶ 59        The City next argues DeSherlia similarly failed to raise a fair question as to its right to occupy the other City property based on an irrevocable license theory.

¶ 60        "A license in respect of real property *** is permission to do an act or a series of acts upon the land of another without possessing any estate or interest in such land." *Mueller v. Keller*, 18 Ill. 2d 334, 340, 164 N.E.2d 28, 32 (1960). A license agreement is not a vested property interest but rather a "revocable privilege." *LMP Services, Inc. v. City of Chicago*, 2017 IL App (1st) 163390, ¶ 39, 95 N.E.3d 1259. "A license protects against an action for trespass for acts done under it before termination. [Citation.] However, upon termination of a license, the licensee's failure to remove its property from the licensor's land constitutes a trespass." *JCRE Holdings, LLC v. GLK Land Trust*, 2019 IL App (3d) 180677, ¶ 15, 136 N.E.3d 202. "Courts of equity will restrain

- 15 -

the exercise of the legal right to revoke a license when the conduct of the licensor has been such that the assertion of the legal title would operate as a fraud upon the licensee." *Mueller*, 18 Ill. 2d at 343.

¶ 61        Here, assuming former Mayor Mosby's authorization of DeSherlia's installation of the fence and shed and the City's issuance of the two building permits constituted a license, there is no evidence in the record to support a claim that the City's revocation of such a license would "operate as a fraud" on DeSherlia. While Joe testified that his inability to access the shed in its previous location was "disruptive" to the day-to-day operations of his business and Alderman Spencer testified it would "just be more convenient" for DeSherlia to restore the shed and fence to the location on the other City property, the record shows DeSherlia (1) continued operating its business after the stop work order and (2) found an alternative location on its property to keep the shed. Under these circumstances, DeSherlia did not raise a fair question as to its right to use the other City property under an irrevocable license theory.

¶ 62                                3. *Equitable Estoppel*

¶ 63        Finally, the City argues DeSherlia failed to raise a fair question as to a clearly ascertainable right under an equitable estoppel theory. DeSherlia responds it has a "ripe" estoppel argument because the City engaged in several affirmative acts authorizing its use of the other City property and DeSherlia relied on those affirmative acts to its detriment.

¶ 64        The doctrine of equitable estoppel applies to municipal bodies such as the City. *Morgan Place of Chicago v. City of Chicago*, 2012 IL App (1st) 091240, ¶ 33, 975 N.E.2d 187. "However, courts do not favor applying the doctrine of equitable estoppel against a public body," and will only invoke equitable estoppel against it if necessary to prevent fraud and injustice. *Id.* The party seeking relief on an equitable estoppel theory must show "(1) the municipality

affirmatively acted; (2) the affirmative act induced substantial reliance; and (3) the aggrieved party substantially changed its position as a result of its justifiable reliance." *Id.*

> "The affirmative act that prompts a party's reliance generally must be an act of the public body itself, such as a legislative enactment, rather than the unauthorized acts of a ministerial officer or a ministerial misinterpretation. [Citations.] The question of whether estoppel should be applied against a municipality in a particular case must be made on an individual basis, after considering all of the circumstances of the case. [Citation.] If under all of the circumstances, the affirmative acts of the public body have created a situation where it would be inequitable and unjust to permit it to deny what it has done or permitted to be done, the doctrine of estoppel may be applied against it." (Internal quotation marks omitted.) *Id.*

¶ 65   Here, we agree with the City that DeSherlia has failed to raise a fair question as to its right to occupy the other City property based on an equitable estoppel theory. First, the fact that former Mayor Mosby orally permitted DeSherlia to use the other City property cannot constitute an affirmative act by the City which would support an equitable estoppel argument. Pursuant to the Municipal Code and as stated above, Mayor Mosby had no authority to unilaterally lease, convey, or otherwise permit DeSherlia to use the other City property. See 65 ILCS 5/11-76-1 (West 2018). Accordingly, Mosby's permission was an act by an agent of the City which was beyond the authority conferred to him and cannot support an equitable estoppel argument as a matter of law. See *Lindahl v. City of Des Plaines*, 210 Ill. App. 3d 281, 296, 568 N.E.2d 1306, 1316 (1991) ("[A] municipality cannot be estopped by an act of its agent beyond the authority specifically conferred on the agent."). Similarly, the building inspector's issuance of the permits for the shed and the fence would not amount to an affirmative act supporting DeSherlia's argument it had a protectable

property interest in its continued use of the other City property. Again, the building inspector had no authority to lease, convey, or otherwise allow the private use of City property. Finally, as discussed above, it is unclear what "fraud and injustice" would result if the City were not estopped from disallowing DeSherlia's use of the other City property. Joe testified he continued to operate his business when he was unable to reinstall the portable shed, storing the items that were normally in the shed in the business's office space. While he described his inability to reinstall the shed in its prior location as "disruptive" and "inconvenient," it is not arguable that mere inconvenience can amount to a fraud or injustice which would be required to invoke the doctrine of equitable estoppel against a municipal body. Accordingly, we find DeSherlia did not raise a fair question as to its right to use the other City property on a theory of equitable estoppel.

¶ 66       Because DeSherlia failed to raise a fair question as to whether it had a clearly ascertainable right to occupy the other City property, we need not address whether DeSherlia demonstrated the remaining elements to establish injunctive relief.

¶ 67                                    III. CONCLUSION

¶ 68       For the reasons stated, we reverse the trial court's judgment.

¶ 69       Reversed.